IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS P. JASIN,<br>    Plaintiff, | :<br>:<br>: |
| v. | :   Civil Action No. 1:04-cv-2188<br>:   (Chief Judge Kane)<br>: |
| DENNIS KOZLOWSKI and MARK SWARTZ,<br>    Defendants | :<br>:<br>: |

# MEMORANDUM

Pending before the Court are cross motions for summary judgment. (Doc. Nos. 154, 127.) Plaintiff seeks summary judgment only on his section 11 claim. (Doc. No. 154.) Defendants argue that summary judgment in their favor is warranted on all claims. (Doc. No. 127.) Defendants contend that Plaintiff has failed to prove loss causation, a necessary element of his section 10(b), 14(a), and 20(a) claims, that he lacks standing to pursue his section 11 claim, and that Plaintiff was never in a contractual relationship sufficient to support his claim for breach of contract or implied covenant of fair dealing claims, and finally, that Plaintiff's remaining state law claims are barred by the statute of limitations. (Id.) For the reasons that follow, Plaintiff's motion for partial summary judgment will be denied. Defendants' motion for summary judgment will be granted in part and denied in part.

I.     BACKGROUND

**Procedural Background**

Plaintiff Thomas Jasin, *pro se*, filed a writ of summons in the Court of Common Pleas of Dauphin County against Defendants Tyco International, Dennis Kozlowski, Mark Swartz, and Juergen Gromer on July 23, 2004. (Doc. No. 1-9.) The complaint was filed September 2, 2004.

1

(Id.) Shortly after Defendants removed the case to federal court, the case was transferred to the District of New Hampshire to be adjudicated with other similar cases as part of Multi-District Litigation ("MDL"). (Doc. No. 9.) After nearly four years of litigation, including disposition of motions to dismiss, completion of discovery, and a class-wide settlement of which Plaintiff Jasin opted out, the case was remanded to this Court. (Doc. No. 13.) After remand, Plaintiff settled all claims except those against Defendants Kowzlowski and Swartz, the former Chief Executive Officer and Chief Financial Officer of Tyco, respectively. (Doc. No. 129 ¶ 56.)

The complaint raises various state and federal claims arising from Kozlowski and Swartz's misrepresentations as to the value of Tyco securities and the financial position of the company. (Doc. No. 1-9.) Plaintiff argues that Defendants Swartz and Kozlowski violated sections 10(b)-5, 14(a), and 20(a) of the Securities Exchange Act of 1934; sections 11, 12(a)(2), and 15 of the 1933 Act; section 1-402 of the Pennsylvania Securities Act of 1972; and Pennsylvania's Unfair Trade Practice and Consumer Protection Law ("CPL"). Plaintiff also argues that Defendants committed the common law torts of fraud, negligent misrepresentation, breach of contract, and breach of duty of good faith and fair dealing.

**Factual Background**

Plaintiff has been an active trader in the stock market for over thirty years. (Doc. No. 153 at 9-10.) Beginning in September 2000 and continuing through April 2002, Plaintiff invested in Tyco stocks by selling significant amounts of put options of Tyco stock to options purchasers. (Doc. No. 1-9 ¶ 18; Doc. No. 129 ¶ 1.) Plaintiff was paid an "option premium" for obligating himself to purchase Tyco stock at a predesignated "strike price," without respect to the actual trading price of the stock, should the options purchaser exercise her "put option" within a certain

2

period of time. As a result of his options contracts, Plaintiff purchased 67,900 shares of Tyco stock between September 11, 2000, and April 22, 2002. (Doc. No. 129 ¶ 49.) Plaintiff bought and sold the bulk of those shares – 55,700 of them – prior to January 2002. (Doc. No. 131-2.)

During the same period that Plaintiff was purchasing Tyco stock, Defendants had been using company funds for significant personal loans and purchases without disclosing those matters to the public or including them in the company accounting records. (Id. ¶ 23; Doc. No. 154 at 11-12.) Defendants also failed to disclose over $8 billion in acquisition expenditures in Tyco's financial statements. (Id. ¶ 19.) Even while these misrepresentations were occurring, Kozlowski, Swartz, and other Tyco representatives continued to assert that all accounting practices were fair and proper. (Doc. No. 153 at 16.)

The falsity of Defendants' representations first began to leak to the media in 2002. On January 2, 2002, a research firm announced that Tyco was the subject of an SEC investigation into its accounting. (Doc. No. 153 at 17.) On January 28, 2002, Tyco released a Proxy Statement that made the first corrective disclosure regarding irregularities in its accounting and prior misrepresentations. (Doc. No. 153 at 18.) Following the disclosure, the price of Tyco shares fell from $42 to $33.65 a share. (Id. ¶ 33.)

After these first major revelations, Plaintiff sold additional put options, resulting in the purchase of 12,200 shares of Tyco stock between February and March of 2002. (Doc. No. 131-2 at 3.) Plaintiff sold all but 2,200 of these shares before the end of March 2002. (Id.)

In early June, news of misconduct by Defendants resurfaced. On June 3, 2002, Kozlowski resigned as Tyco CEO amid rumors that he was the target of an ongoing state criminal investigation. (Doc. No. 1-9 ¶ 33, Doc. No. 153-6 ¶ 99.) The price of Tyco stock continued to

decline, eventually reaching $16.05 a share, as questions arose regarding the integrity of the company. (Doc. No. 1-9 ¶ 33.) On June 7, 2002, Tyco confirmed the criminal investigation into Kozlowski and announced its own investigation into the executives' misuse of company funds for personal use. (Id.) Defendant Swartz also resigned from Tyco in 2002. (Doc. No. 129 ¶ 58.) Both Defendants were eventually convicted of multiple counts of larceny and enterprise corruption in 2005. (Id. ¶¶ 57-59.)

## II.	STANDARD OF REVIEW[1]

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this

---

[1] Though at times Plaintiff appears to assert that pleading facts is enough at this point, he explicitly acknowledges that he is on notice of his affirmative duty to produce evidence in support of his claims to withstand a motion for summary judgment. (Doc. Nos. 153 at 14-15; 154 at 34-35.) Plaintiff also implicitly acknowledges his obligation to respond to every argument adequately raised by Defendants that he does not intend to waive. He cites to an order from an earlier stage in the proceedings in which Judge Barbadoro of the District of New Hampshire ruled that the plaintiffs' failure to respond to an argument raised by the defendants constituted waiver of the claim. See In re Tyco Int'l., Ltd., No. MDL 02-1335-B, 02-266-B 2004 WL 2348315 at *15 (D.N.H. Oct. 14, 2004) ("Plaintiffs have not attempted to respond to defendants' plausible causation argument, and thus they have waived their right to object to the dismissal of the § 14(a) claims on this basis.").

determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the nonmoving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the nonmoving party must provide, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### III. DISCUSSION

The Court begins with the arguments raised in Defendants' motion for summary judgment. To wit, Defendants argue that Counts I, II, III, VIII, and IX – the Securities Act of 1934 claims – must be dismissed for failure to raise a question of material fact as to loss

causation; Counts IV, V, and VI – the Securities Act of 1933 claims – must be dismissed for lack of standing; Counts VII, VIII, and IX – the Pennsylvania Securities Act, fraud, and misrepresentation claims – must be dismissed as time-barred; Count X – the Pennsylvania Consumer Protection Law claim – must be dismissed because stocks are not considered goods under the CPL; and Counts XI and XII – the contracts claims – must be dismissed because there was no contractual relationship between the parties. Plaintiff argues that there is sufficient evidence on the record to demonstrate loss causation. He also argues that Tyco's corrective statements indicate admissions of prior false and misleading statements, therefore he is entitled to summary judgment on the section 11 claim. Plaintiff does not directly respond to Defendants' statute of limitations or standing arguments. Though Plaintiff asserts that there was a contractual relationship sufficient to support his breach of contract claims, he does not explicitly refer the Court to any such evidence on the record. (Doc. No. 153 at 11.) The Court will take up all these issues in turn, beginning with the state law claims.

### A. Application of the Statute of Limitations to Plaintiff's State Law Claims

Defendants argue that Plaintiff's Pennsylvania Securities Act, common law fraud, and negligent misrepresentation claims are all time-barred. As stated above, Plaintiff does not respond to this argument. For the following reasons, even if the argument is not deemed waived by Plaintiff's failure to object, Defendants' motion for summary judgment will be granted.

#### i. Pennsylvania Securities Act

Under the Pennsylvania Securities Act, it is unlawful "to induce the purchase or sale of any security by the circulation or dissemination of information to the effect that the price of the security will or is likely to rise or fall . . . ." 70 P.S. § 1-402(c). To recover for a violation of this

6

provision, however, a plaintiff must file suit within five years of the date of the act or within one year of the date the plaintiff knows or should have known of the facts constituting the violation, whichever happens first. 70 P.S. § 1-504(a). Defendants argue that Plaintiff knew or should have known of the facts constituting the violation on or before June 2002. It follows, Defendants contend, that Plaintiff's failure to file until July 2004 requires that his claims be denied.

The undisputed material facts indicate that public disclosure of the misrepresentations and troubles faced by Tyco began in January 2002 and continued into June 2003. Not only was Plaintiff an active trader during this period, but he acknowledged in his complaint that he read "Defendant's statement, press releases and guidance given to securities analysts prior to and during the period from September 2000 through April 2002." (Doc. No. 1-9 ¶ 18.) Using Plaintiff's expert's own findings, after close of trading on January 28, 2002, it was "widely reported" that in 2001 Tyco had made a $10 million payment to one of its directors, Frank Walsh, and had contributed another $10 million to a charity for which he was a trustee. (Doc. No. 153-6 ¶ 90.) This news raised questions from numerous sources about Tyco's corporate governance. (Id.) On February 4, 2002, The Wall Street Journal raised questions about the completeness of Tyco's prior financial disclosures when it reported that Tyco had failed to disclose over $8 billion in expenditures. (Id. ¶ 91.) On April 29, 2002, a rating of Tyco's debt was significantly downgraded and an article in Barron's implied that the company's accounting practices and acquisitions may have enabled it to "inflate, possibly quite substantially, reported earnings." (Id. ¶ 96.) On June 3, 2002, Tyco stock price plummeted in response to Kozlowski's resignation as Tyco CEO amid publication of an ongoing state criminal investigation into his tax practices. (Id. ¶ 99; Doc. No. 1-9 ¶ 33.) The following week, on June 7, 2002, Tyco announced

7

that it had begun an internal investigation into Kozlowski and other executives' use of company funds. (Doc. No. 1-9 ¶ 33.) Tyco also confirmed the ongoing criminal investigation into Kozlowski at that time. (Id.) Concurrently, The Wall Street Journal reported that the SEC had begun an investigation into loans provided to Kozlowski by Tyco, that the investigation might expand to other executives besides Kozlowski, and that the SEC had delayed the sale of Tyco's finance unit. (Doc. No. 153-6 ¶ 101.) Also on June 7, 2002, Moody's and Standard & Poors, two reputable credit rating companies, cut Tyco's credit rating to "below investment grade." (Id.) On June 11, 2002, more self-dealing among Tyco directors was revealed: news sources reported that Tyco had been paying $2 million per year to a former Tyco director's law firm. (Id. ¶ 102.) Two days later, Tyco officially announced that it would restate its financial results and that the SEC had reopened its investigation into Kozlowski. (Id. ¶ 103.) Though the 8-K that "discussed at length the improper and unlawful conduct of its former officers and directors . . . including their excessive compensation and self-dealing" was not filed until September 17, 2002, Defendants have raised a prima facie case that a reasonably diligent plaintiff would have been on notice of Defendants' misleading actions by June 2002 at the latest. (Doc. No. 153-6 ¶ 105.) Plaintiff's failure to object to or to present evidence that he did not know or should not have known about the misconduct by June 2002 is fatal to his claim. Because Plaintiff did not file this action until July 2004, over two years after he knew or should have known of his injury, his Pennsylvania Securities Act claim is time-barred.

        ii.        **Common Law Fraud and Negligent Misrepresentation**

Pennsylvania law requires that fraud and negligent misrepresentation claims be brought within two years of the date the fraud is discovered or should have been discovered by a

reasonably diligent person. 42 Pa. Con. Stat. Ann. § 5524(7); see also Toy v. Metro. Life Ins. Co., 863 A.2d 1, 8 (Pa. Super. Ct. 2004) (applying two-year statute of limitations to date when a reasonable person exercising due diligence should have known of her injury). As with the preceding claim, all evidence presented indicates that a reasonably diligent person would have been on notice of the fraud and misrepresentations committed by Defendants by June 2002. Because Plaintiff did not file his writ of summons, which tolls the statute of limitations, until July 23, 2004, the Court finds that Plaintiff's fraud and misrepresentation claims, Counts VIII and IX, must also be dismissed as time-barred. See Stinson v. Kaiser Gypsum Co., 972 F.2d 59, 61 (3d Cir. 1992) (holding that a writ of summons tolls the statute of limitations period).

### B. Whether Securities are "Goods" Under the CPL

In Count X, Plaintiff alleges a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("CPL"), 73 P.S. § 201-1, et seq. The CPL states that "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes . . . may bring a private action" to recover for another's use of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 73 P.S. §§ 201-9.2; 201-3. The statute defines "unfair or deceptive acts" to include fraudulent or deceptive conduct, but does not define the term "goods." 73 P.S. § 201-2.

Courts have divided on whether securities should be considered "goods" actionable under the CPL. See Algrant v. Evergreen Valley Nurseries Ltd., 126 F.3d 178, 186-87 (3d Cir. 1997) (collecting cases); Klein v. Opp, 944 F. Supp. 396, 398 (E.D. Pa. 1996) ("Plaintiff's claims for violation of the [CPL] must be dismissed because that statute is inapplicable to purchases of securities."). As noted by the Third Circuit Court of Appeals in Algrant, the courts that have

9

found securities fraud claims actionable under the CPL have done so primarily where the allegations were that a brokerage firm committed fraud in the actual transaction of the security purchase or in explaining the services they would provide to the consumer. Algrant, 126 F.3d at 187. Such is not the claim in the case *sub judice*, nor was it in Algrant.

In Algrant, the defendants failed to disclose important facts regarding the value of the company and the self-dealing involved, resulting in a $3.2 million over-valuation of the stocks the plaintiffs had purchased. The Third Circuit held that such a claim was not intended to be actionable under the CPL. Id. at 186-88 ("[W]e predict, as did the district court, that the Pennsylvania Supreme Court would hold that investment securities are not goods under the UTP/CPL and therefore the UTP/CPL does not provide a cause of action for a party alleging fraud in the securities themselves."). Similarly, Plaintiff alleges that Defendants failed to disclose all of the liabilities incurred by Tyco, their self-dealing, and an accurate picture of Tyco's finances, which resulted in significant over-valuation of the stocks when he purchased them. Plaintiff's claim is factually analogous to the one relied upon in Algrant. The Court finds, then, as did the court in Algrant, that Plaintiff's CPL claim must be dismissed because it does not allege deceptive conduct in the sale of goods for personal purposes as the term is meant by the CPL. Summary judgment will be granted in favor of Defendants on Count X.

### C. Existence of a Contractual Relationship

In Count XI of the complaint, Plaintiff alleges a breach of contract claim. Defendants seek dismissal of this claim on the basis that there was no contractual relationship between themselves and Plaintiff. Though Plaintiff argues that there was such an agreement, he fails to actually support his argument with any evidence. Rather, in his brief in opposition, Plaintiff

states that he "will present evidence, including telephone records, of an oral commitment (contract) made by Defendant Swartz that Tyco's financial statements were accurate." (Doc. No. 153 at 11.) Even when viewed with the liberality required of a *pro se* filing, the Court cannot find that Plaintiff's promise to provide support in the future is sufficient to withstand summary judgment. Not only has Plaintiff failed to refer explicitly to the record for evidence, but it is unclear to the Court that the evidence Plaintiff describes – an oral statement from Defendant Swartz affirming the accuracy of Tyco's financial statements – would be sufficient to establish a contract between Defendants and Plaintiff, even if made a part of the record.

Establishment of a contract requires, at a minimum, an offer, acceptance, and consideration. Jenkins v. Cnty. of Schuylkill, 658 A.2d 380, 383 (Pa. Super. Ct. 1995). Even in the case of an implied contract, a court must be able to infer an intent to enter into a contract from the surrounding circumstances or the parties' actions. Liss & Marion, P.C. v. Recordex Acquisition Corp., 983 A.2d 652, 659 (Pa. 2009) (finding an implied in fact contract from the conduct of the parties). Plaintiff's evidence falls far short of meeting the minimum requirements to establish a contract.

Absent a contractual relationship, Plaintiff's claims for breach of contract and breach of implied covenant of good faith and fair dealing both must be dismissed. See Jenkins, 658 A.2d at 383 (dismissing breach of contract claim for failure to establish the existence of a contract); Donahue v. Fed. Express Corp., 753 A.2d 238, 242-43 (Pa. Super. Ct. 2000) (finding that implied covenant of good faith could apply "to those contractual terms that exist beyond the at-will employment relationship," but not for the termination of an at-will employment relationship); Greeger Brick and Bldg. Supply Inc. v. Mid-State Bank and Trust Co., 560 A.2d

11

151, 154 (Pa. Super. Ct. 1989) (discussing the covenant of good faith as an implied covenant between contracting parties but finding that it could not be applied to representations outside a contractual relationship). Summary judgment in favor of Defendants will be granted as to Counts XI and XII of Plaintiff's complaint, the breach of contract claim and the breach of implied covenant of good faith claim.

### D. Evidence of Loss Causation

The Court turns now to the federal securities claims, which comprise the bulk of the issues in this case. Defendants argue that Plaintiff's section 10(b) and 14(a) claims must be dismissed because Plaintiff has failed to provide any evidence from which a reasonable jury could find loss causation. To succeed on a section 10(b) claim, a plaintiff must prove:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008). To survive summary judgment on a section 14(a) claim, a plaintiff must prove:

> (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link in the accomplishment of the transaction."

Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir. 1992) (quoting Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 385 (1970)). In other words, both section 14(a) and section 10(b) require proof of loss causation – economic injury caused by a defendant's misrepresentations. The Supreme Court has held that the causation element may not be satisfied simply by a plaintiff

pleading and proving that he purchased stock at an artificially-inflated price. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005) ("[A]n inflated purchase price will not itself constitute or proximately cause the relevant economic loss."). This is because, as the Court reasoned, "at the moment the transaction takes place, the plaintiff has suffered no loss." Id. Indeed, if the purchaser buys shares at an inflated price but also sells them "before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." Id. Even if the purchaser purchased shares at an inflated price and sells them "after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss," but does not necessarily indicate that the misrepresentation caused the loss. Id. at 342-43 (emphasis in original). Because a decreased price might simply be a reflection of changed economic circumstances, it is important for a plaintiff to provide causation evidence, usually through an expert opinion, to support the loss causation factor. See Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 301 (3d Cir. 1991) ("As a general rule, plaintiffs alleging securities fraud rely on expert testimony to establish both the fact of damage and the appropriate method of calculation."); In re Williams Sec. litig.-WCG Subclass, 558 F.3d 1130, 1143 (10th Cir. 2009) (granting summary judgment for the defendants because the plaintiffs did not present expert or non-speculative evidence of loss causation).

Amid the numerous attachments filed by Plaintiff is an expert report by Dr. Gregg Jarrell that speaks to the element of loss causation for a securities purchaser in Plaintiffs' situation.[2]

---

[2] Defendants' statement of undisputed material facts indicates that Plaintiff failed to disclose any expert report by the deadline, but does not specifically refer to Dr. Jarrell's report. (Doc. No. 129 ¶¶ 50-51.) It is unclear to the Court whether Defendants are even aware of Plaintiff's submission of the report. Nonetheless, the report has been timely filed as part of Plaintiff's opposition to Defendants' summary judgment motion and is, therefore, properly on the record for the Court's consideration. The Court will not ignore the report absent a motion to strike the report, specifically addressing why the failure to timely disclose the report justifies the

(Doc. No. 153-6.) In his report, Dr. Jarrell succinctly explains loss causation: "Investors can only recover damages for shares purchased that were subsequently held over a corrective disclosure. Therefore, any Tyco common stock purchased during the Damages Period and sold before the next corrective disclosure are not damaged." (Doc. No. 153-6 ¶ 125.) Dr. Jarrell then provides an analysis of why he believes the market reaction to certain disclosures is evidence that Plaintiff suffered losses directly related to Defendants' misconduct. This report is sufficient to create a question of fact that loss causation exists for securities bought prior to and sold after certain disclosures. Dr. Jarrell created a table setting out the time periods during which stock must have been purchased and sold to indicate that a loss in value was caused by a news release or a corrective disclosure. (Doc. No. 153-6 at 65.) Yet, even accepting all of Dr. Jarrell's opinions as true, the Court finds that the sale of only a portion of Plaintiff's losses can be linked to Defendants' misconduct.

The evidence of record indicates that all of Plaintiff's purchases occurred between two time periods listed in Dr. Jarrell's table: the December 9, 1999 through January 28, 2002 period and the February 5, 2002 through April 24, 2002 period. (Doc. No. 129.) By the words of Plaintiff's own expert, securities purchased during the first period–December 9, 1999, through January 28, 2002,–must have been sold on or after January 29, 2002, for the purchaser to have been damaged by Defendants' misconduct. (Doc. No. 153-6 at 65.) All evidence related to Plaintiff's stock purchases and sales indicates that every share Plaintiff purchased in the first

---

"extreme sanction" of excluding it. See Nicholas v. Pa. State Univ., 227 F.3d 133, 147 (3d Cir. 2000) (requiring a court to consider four factors before excluding critical evidence as a sanction for failure to comply with a discovery order); Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997) (describing exclusion of critical evidence as an "extreme sanction not normally to be imposed absent a showing of willful deception" (internal citations omitted)).

period was sold before January 29, 2002. (Doc. No. 131-2 at 2-3.) Put otherwise, even Plaintiff's own expert report agrees with Defendants that Plaintiff both purchased and sold the first 55,700 shares at an artificially inflated price, thus he cannot demonstrate loss causation with respect to those sales. Dura Pharm., 544 U.S. at 342.

The remaining 12,200 shares of Tyco stock purchased by Plaintiff were purchased during a different period in Dr. Jarrell's analysis: the period from February 5, 2002, through April 24, 2002. (Doc. No. 131-2 at 3.) Again following the analysis prepared by Plaintiff's expert, loss causation can only be shown for stocks bought during this period that were also sold on or after April 25, 2002. (Doc. No. 153-6 at 65.) All evidence of Plaintiff's securities transactions indicates that Plaintiff sold 10,000 of the 12,200 shares prior to April 25, 2002, leaving only 2,200 shares that may have been affected by market disclosures of Defendants' misconduct. (Doc. No. 131-2.) Accordingly, Plaintiff's own expert and the undisputed facts on the record indicate that, at most, Plaintiff can demonstrate loss causation for the 2,200 shares of Tyco stock he purchased between February 5, 2002, and April 24, 2002, and sold after April 25, 2002.

The Court finds that Plaintiff has adequately created a question of material fact as to whether he suffered loss causation for the 2,200 shares he purchased after February 2, 2002, and did not sell until after April 25, 2002; summary judgment will be denied to Defendants with respect to Plaintiff's section 10(b) and 14(a) claims regarding these 2,200 shares. Summary judgment will be granted to Defendants on the section 10(b) and 14(a) claims with respect to Plaintiff's purchase of the remaining 65,700 shares.

### E. Underlying Violation to Support Plaintiff's Section 20(a) Claim

Defendants next argue that they are entitled to judgment on Plaintiff's § 20(a) claim.

15

Relying on their arguments in the preceding sections, Defendants contend that Plaintiff has not, and cannot, demonstrate the requisite "predicate violation" because he has not demonstrated loss causation.

Given the Court's findings in the preceding section that Plaintiff has provided evidence of loss causation with respect to the purchase and sale of 2,200 shares, Defendants' motion for summary judgment on Plaintiff's section 20(a) claims will be granted except as to the purchase of the 2,200 shares sold after April 25, 2002.

**F.     Standing**

Defendants maintain that Plaintiff's section 11, 12(a)(2), and 15 claims must be dismissed because he does not have standing to pursue them. Plaintiff does not directly respond to Defendants' standing arguments but does assert that he is entitled to summary judgment on the section 11 claim.

   **i.     Section 11 Claim**

Defendants next argue that Plaintiff lacks standing to bring a section 11 claim because he has not linked his securities purchases to an initial public offering in which false representations were made. Plaintiff responds that he is entitled to summary judgment on the section 11 claim because it is beyond dispute that Defendants prepared registration statements containing false statements. Because the existence of standing is an essential prerequisite to suit, the Court takes up Defendants' argument first.

The Supreme Court has explained that "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission," to establish a prima facie case of a section 11 violation. In re Suprema Specialties, Inc. Sec. Litig.,

16

438 F.3d 256, 269 (3d Cir. 2006) (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983)). Though section 11 creates "virtually absolute liability" against those who prepare faulty registration statements, a purchaser must be able to "trace" her purchase to the initial offering to have standing to bring her claim. See In re Suprema, 438 F.3d at 274 n.7 (citing with approval Lee v. Ernsy & Young, LLP, 294 F.3d 969, 978 (8th Cir. 2002)); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 286 (3d Cir. 1992) (requiring traceability of an aftermarket stock purchase to the registration statement); Joseph v. Wiles, 223 F.3d 1155, 1159 (10th Cir. 2000) ("[A]n aftermarket purchaser has standing to pursue a claim under section 11 so long as he can prove the securities he bought were those sold in an offering covered by the false registration statement.").

Despite this low bar, the Court has not found any evidence, and Plaintiff has pointed to none, to provide support for the proposition that the securities Plaintiff purchased are traceable to an initial offering accompanied by an inaccurate registration statement. Though Plaintiff details numerous false statements made by Defendants, he does not address the traceability element in any way. (Doc. Nos. 153-55.) Accordingly, Defendants' motion for summary judgment will be granted as to the section 11 claim; Plaintiff's motion for partial summary judgment will be denied for lack of standing.

   ii.  Section 12(a)(2) Claim

Claims pursuant to section 12(a)(2) can only be brought by traders who purchase shares directly from a public offering. In this respect, section 12(a)(2) is more restrictive than section 11; even those aftermarket traders who show traceability to the public offering do not have standing to sue under section 12(a)(2). See In re Suprema, 438 F.3d at 274 n.7 ("Section 12(a)(2) should not be expanded to aftermarket trading." (internal citations omitted)). As with the

preceding claim, Plaintiff has not demonstrated that he purchased shares from a public offering. Summary judgment on his section 12(a)(2) claim will be granted in favor of Defendants.

### iii. Section 15 Claim

Section 15 of the Securities Act holds corporate officers and directors liable for violations of section 11 and section 12(a)(2). The violation only applies, however, when an underlying section 11 or section 12(a)(2) violation has been found. See In re Adams Golf, Inc., Sec. Litig., 381 F.3d 267, 273 (3d Cir. 2004) ("Section 15 permits investors to recover, on a joint and several basis, from 'control persons' who would be otherwise liable under sections 11 and 12(a)(2)."). Because Plaintiff does not have standing to pursue his section 11 and 12(a)(2) claims, Plaintiff's section 15 claim will also be denied. Summary judgment on Count VI is granted in favor of Defendants.

## IV. CONCLUSION

In conclusion, Plaintiff's motion for partial summary judgment will be denied because he has not provided evidence of standing to raise a section 11 claim. Defendants' motion for summary judgment will be granted, except as to Plaintiff's section 10(b), 14(a), and 20(a) claims for the 2,200 Tyco stocks he bought after February 4, 2002, and sold after April 25, 2002.

An order consistent with this memorandum follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS P. JASIN, : | |
|    Plaintiff, : | |
| : | Civil Action No. 1:04-cv-2188 |
| v. : | (Chief Judge Kane) |
| : | |
| DENNIS KOZLOWSKI and MARK : | |
| SWARTZ, : | |
|    Defendants : | |

## ORDER

**AND NOW**, on this 3rd day of November 2010, upon consideration of Plaintiff's motion for partial summary judgment (Doc. No. 154) **IT IS HEREBY ORDERED** that the motion is **DENIED. IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Doc. No. 127) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Summary judgment in favor of Defendants is granted with respect to Counts IV, V, VI, VII, VIII, IX, X, and XI.

2. Summary judgment in favor of Defendants as to Counts I, II, and III is granted only with respect to the stocks Plaintiff purchased and sold prior to April 25, 2002. Summary judgment is denied as to Plaintiff's section 10b, 14(a), and 20(a) claims regarding the 2,200 securities he sold after April 25, 2002.

The Clerk of Courts shall defer entry of judgment until the final disposition of all claims.

                                                    S/ Yvette Kane
                                                    Yvette Kane, Chief Judge
                                                    United States District Court
                                                    Middle District of Pennsylvania